IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 10, 2024 Session

## AARON OSTINE v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Cheatham County**
**Nos. 16307, 16705  Larry J. Wallace, Judge**

_____

### No. M2023-01757-CCA-R3-PC
_____

A Cheatham County jury convicted the Petitioner, Aaron Ostine, of first degree premeditated murder, first degree felony murder, and aggravated robbery. The trial court imposed an effective life sentence, and this court affirmed the judgments on appeal. *State v. Ostine*, No. M2013-00467-CCA-R3-CD, 2014 WL 2442988 at *1 (Tenn. Crim. App. May 28, 2014), *perm. app. granted* (Tenn. Oct. 15, 2014). The Petitioner filed a Rule 11 application, pursuant to the Tennessee Rules of Appellate Procedure, to the Tennessee Supreme Court. Our supreme court granted the application and remanded the case for our reconsideration in light of its holding in *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014). After considering the facts and circumstances of the case as compared to those in *Jackson*, this court again affirmed the trial court's judgment. *State v. Ostine*, No. M2013-00467-CCA-R3-CD, 2015 WL 7009058, at *1 (Tenn. Crim. App. Nov. 12, 2015), *perm. app. denied* (Tenn. Mar. 23, 2016). The Petitioner timely filed for post-conviction relief based upon claims of ineffective assistance of counsel. After a hearing, the post-conviction court denied relief. The Petitioner appeals, maintaining that he received the ineffective assistance of counsel and asserts that the cumulative effect of his trial counsel's errors entitle him to relief. After review of the record and applicable law, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Andrew E. Mills, Dickson, Tennessee, for the appellant, Aaron Ostine.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Wendell Ray Crouch, Jr., District Attorney General; and Margaret F. Sagi, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## I. Facts

A Cheatham County jury convicted the Petitioner of first degree premeditated murder, first degree felony murder perpetrated during a robbery, and aggravated robbery. The trial court merged the murder convictions and imposed a life sentence for the murder convictions and a twelve-year concurrent sentence for the aggravated robbery conviction. The Petitioner timely filed a motion for new trial which the trial court denied on February 6, 2013. On February 11, 2013, the Petitioner filed his notice of appeal asserting insufficient evidence, that his statement to police should have been suppressed, and prosecutorial misconduct. On direct appeal, this court affirmed the trial court in all respects. *Ostine,* 2014 WL 2442988, at *1.

This court summarized the facts presented at trial as follows:

Cynthia Moore testified that she and the victim had been neighbors for twenty years. She said that the victim would sometimes join her when she and a friend would walk around the neighborhood.

Ms. Moore recalled the evening of October 12, 2010, saying that she and her friend were on their third lap walking around the block when she noticed that the victim had arrived home at approximately 9:30 p.m. She and her friend walked up to the victim's house where they normally talked with the victim in the evenings, but, on this night, Ms. Moore said the victim "really wasn't talking to us." Ms. Moore said she remained at the victim's home for only about fifteen minutes. She explained the short visit saying that she left "because he was totally acting like he was doing something else, which was out of character."

. . . .

Robert Guye, III, the victim's son, testified that the victim had owned a .38 revolver with a wood handle and that the victim "always kept ammunition" for the gun in the house. He said that the gun was a "six-shooter" and that he and the victim used to fire it together. He confirmed that, after the incident on October 12, this gun and a video camera were missing from the victim's home. Mr. Guye identified a gun that looked like the victim's missing gun.

2

Daniel Anderson, an Ashland City police officer, testified that, on the morning of October 13, 2010, he was dispatched to the victim's residence on Jefferson Street. When he arrived, the victim's sister-in-law, Dorian Bruce, was standing across the street. Ms. Bruce told Officer Anderson that she had been asked to "check on" the victim. She said she walked up to the front door, "saw part of the victim," stepped off of the porch, and called 911. After speaking with Ms. Bruce, Officer Anderson proceeded to the front door of the residence and announced a police presence before entering the house. Officer Anderson said that the front door of the house was open and that the storm door was closed.

. . . .

Officer Anderson testified that, after securing the scene, he entered the house from the side door in the carport area. He said that this door was "propped opened." He estimated that the door was opened "a couple of feet."

Johnny Hunter, an Ashland City Police Department officer, testified that he reported to the crime scene on October 13, 2010. At the scene, he took pictures of the inside and the outside of the victim's house and a vehicle. In addition to photographing the scene, Officer Hunter said that he helped collect evidence, process the scene for latent fingerprints, and collect blood samples.

. . . .

Officer Hunter testified that a nine millimeter shell casing was found in close proximity to where the victim was lying on the floor. Officer Hunter identified a photograph of a bullet that was found in the left side of the kitchen sink. The shell casing and bullet were both collected and sent to a lab at the Tennessee Bureau of Investigation ("TBI") for analysis. In front of the sink, a "rear sight" of a weapon was found lying on the carpet. Officer Hunter said that a rear sight would have been removed from the weapon by "force."

Officer Hunter testified about the state of the two bedrooms in the home. He said that the "south bedroom" in the home had "dresser drawers and debris that's been pulled out of them, and turned over, and spilled." He identified a box of .38 special ammunition found in a night stand in the south

3

bedroom. The north bedroom had a "computer area," and the computer had been overturned onto the floor. This room also appeared to have been ransacked.

. . . .

Wanita Hubbard testified that she worked at Copperstone Village Apartments in Nashville, Tennessee as the groundskeeper. She said that between 6:30 a.m. and 7:00 a.m. on October 13, 2010, she was cleaning the parking lot of the apartment complex. She opened the full dumpster to throw away trash she had collected, and a driver's license for "Robert Guy, Junior" fell out. Ms. Hubbard said that she gave the driver's license to her supervisor, Ollie Lunden. Ms. Hubbard said that she also advised her supervisor that she had seen other items in the dumpster that appeared to have "c[o]me out of a billfold."

. . . .

Patrick Looney, a TBI special agent, testified that he reported to Copperstone Village Apartments between 9:00 a.m. and 10:00 a.m. on the morning of October 13, 2010. Agent Looney identified a photograph of two dumpsters that he crawled inside of and searched for evidence. He said that the dumpsters he searched were located between apartment buildings "A" and "B." He explained that when he first arrived at the complex he spoke with the apartment complex manager. The manager told him that an employee, Ms. Hubbard, had found a driver's license inside the dumpster.

After speaking with the manager, Agent Looney requested another agent be sent to the location for assistance and blocked off the dumpsters from use. Once assistance arrived, Agent Looney put on protective gear and crawled into the dumpster to search for evidence. Agent Looney identified the following items that he had retrieved from the dumpster and from the manager: a Trojan condom, an Eddy Murphy tape, a brown wallet, an Advance Financial card, a Region's Visa card, the driver's license of Robert Guy, a Cheatham County Voter Registration card, a True Care HMO card naming Laura Guy, a United Healthcare card, a police officer's business card, and a Tractor Supply business card. Agent Looney also identified "some kind of address card with phone numbers" that contained the following names: Norma Guye, Sharon Sullivan, Robert Guye, Senior, and Shirley Guye. Agent Looney identified a blue bandanna that he recovered

4

from the dumpster. Agent Looney said that he also collected six pairs of shoes, in varying stages of wear, from the dumpsters. Agent Looney identified a pair of Nike Air Jordans that he had recovered from the dumpster. These shoes were later sent to a TBI lab for examination. Agent Looney said that he also found in the dumpster a pair of cotton knit gloves that had plastic gloves inside them, which were also sent for examination at the TBI lab.

Nickey Leeper testified that on the night of October 12, 2010, he played in a softball tournament in Ashland City. He parked in a post office parking lot at around 5:45 p.m. and returned to his truck at around 11:00 p.m. When he got back into his truck, he noticed that his GPS was missing. He said that he called police that night but never went to the police station to fill out a report, explaining that "[i]t was [his] fault" because he left the truck doors unlocked. Approximately six months later, the police showed him a GPS, and Mr. Leeper confirmed that it was his GPS. . . .

Joe Craig, a TBI special agent, testified about the progression of the investigation in this case. He stated that, based on the location of the apartment complex where the contents of the victim's wallet were found, he focused his investigation on the East Nashville or North Nashville area. Agent Craig learned that the Ashland City Police Department had collected some videotapes from the victim's residence. One of the video tapes showed an unknown black female who appeared to be five feet, four inches tall and in her early twenties. An image was generated from the video footage and shown to the management of Copperstone Village Apartments, and the female was identified as a resident of the apartment complex, Joycean Harrison. Joycean Harrison lived in building B with her sister, Tavaigner Harrison. Agent Craig spoke with Joycean Harrison who provided nothing "significant" in the way of the investigation.

Agent Craig later developed Timothy Short as a possible suspect. Mr. Short lived in the Copperstone Village Apartments, building A. Agent Craig said that Mr. Short's building was "directly across" from the building in which the Harrison sisters lived. The dumpsters where the victim's personal effects were found were located between these two buildings. Agent Craig said that he spoke with Mr. Short on October 20, 2010, and obtained consent to search the apartment. During the search, Detective Nelson found a CalTech-9 gun with a missing rear sight. The gun was sent to the TBI crime lab for testing, and the gun was confirmed to be the gun that fired the cartridge found at the victim's residence.

5

Agent Craig testified that he arrested Mr. Short for first degree murder. Mr. Short told Agent Craig about cameras he had bought from Tavaigner Harrison, which included a Pentax 35 millimeter camera. Police later recovered the cameras from Mr. Short's apartment and confirmed that the cameras were the victim's.

Agent Craig testified that, based on information from Joycean Harrison, he located Montario Ostine, the [Petitioner]'s brother. Agent Craig said that, at this time, Mr. Short was in custody for a first degree murder charge, and Joycean Harrison was in custody on a prostitution charge for having had sex with the victim for $50. Agent Craig explained that, although Mr. Short was in custody, he still did not feel "completely comfortable" that the evidence was consistent with Mr. Short's involvement in the homicide, so he met with Montario Ostine in the parking lot of Vanderbilt Hospital, Montario Ostine's place of employment, for a "quick interview." After meeting with Montario Ostine, Agent Craig received additional information indicating that Montario Ostine and the [Petitioner] were involved in these offenses. Agent Craig said that his investigation then began to focus on the Ostine brothers. Agent Craig obtained a search warrant for Montario Ostine's car, but recovered nothing.

Agent Craig testified that, in December 2010, he interviewed both Montario Ostine and the [Petitioner] and that both men denied any knowledge of the robbery and shooting. On February 14, 2011, Agent Craig interviewed Tavaigner Harrison at the Williamson County jail in the presence of her attorney. Tavaigner Harrison gave a full statement about the offenses. Agent Craig said that he did not seek an arrest warrant for Montario Ostine or the [Petitioner] at that time because he first wanted to develop more physical evidence against Montario Ostine and the [Petitioner]. He said that, on March 14, 2011, he obtained a second search warrant for Montario Ostine's car. Agent Craig said that, at that time, he also conducted a "follow-up interview" with Montario Ostine. Based on the information learned during the interview, Agent Craig charged Montario Ostine with first degree murder and obtained a warrant for the [Petitioner]. Police officers arrested the [Petitioner] the following day, and he gave a confession to police.

. . . .

6

Timothy Short testified that, on or about October 12, 2010, Tavaigner Harrison and "two other guys," Montario Ostine and the [Petitioner], came to his apartment. Tavaigner Harrison asked to borrow one of Mr. Short's pistols. Mr. Short said that he had four or five pistols at the time. He retrieved one of his guns and gave it to Tavaigner Harrison, who returned the gun to him the following day. Mr. Short said that Tavaigner Harrison never indicated why she wanted to borrow the pistol. When Tavaigner Harrison returned the pistol, Mr. Short bought "a couple of cameras" from her for "thirty dollars or something."

`      Mr. Short identified in court the CalTech-9 that he loaned to Tavaigner Harrison in October 2010. Mr. Short denied any involvement in the murder of the victim. He said that he had never been to Ashland City and did not know the victim. Mr. Short agreed that he pled guilty to facilitation of aggravated robbery for giving Tavaigner Harrison the gun used in these offenses. He was sentenced to four years, suspended to time served.

       . . . .

       Tavaigner Harrison testified that in October 2010, she lived at Copperstone Village Apartments with her sister, Joycean Harrison. Tavaigner Harrison said that she met the victim through a friend. . . . [S]everal days before the shooting, Montario Ostine and the [Petitioner] raised the idea of "getting a lick," or robbing someone. . . . When the idea of robbing someone was raised, Tavaigner Harrison suggested the victim because he had told her he would be out of town on business. Taviagner Harrison said she went to Mr. Short, a neighbor she had met when she moved into the apartment complex, to borrow a gun. Tavaigner Harrison recalled that she told Mr. Short that her brothers, referring to Montario Ostine and the [Petitioner], wanted to borrow a gun "to go and run up in this man's house while he wasn't there." Tavaigner Harrison explained that she told Mr. Short that Montario Ostine and the [Petitioner] were her brothers because she believed that, if he knew they were her friends, he might not loan the gun.

       Tavaigner Harrison testified that, since the victim would not be at home, she believed the purpose of the gun was to "make them be a little bit more bold." She said that she did not believe that the Ostine brothers would hurt anyone. Tavaigner Harrison said that at around 5:30 p.m. or 6:00 p.m. on October 12, 2010, Montario Ostine drove her and the [Petitioner] to the victim's home. She initially had difficulty recalling where the victim lived,

7

and they drove past Ashland City. She instructed Montario Ostine to turn the car around, and they returned, eventually finding the victim's home. She said they drove by the victim's home, and she saw that he was home. She said "two young white women" were also there. Montario Ostine drove past the house three or four times before driving to a nearby post office where Tavaigner Harrison looked for a bathroom. When she returned to the car, the [Petitioner] stated that he was going to try and take a GPS that was in a white truck parked next to them. The [Petitioner] got out of the car and opened the unlocked passenger door of the white truck and took the GPS, which was later sold to Mr. Short.

Tavaigner Harrison testified that they returned to the victim's home "some time after ten." Montario Ostine parked a short distance from the victim's home on Water Street. She recalled that one of the brothers put a bandana on to cover his face and that the other put on a "stocking cap that you can pull [ ] over your whole face." The two men got out of the car and walked to the victim's house while Tavaigner Harrison waited in the car. Tavaigner Harrison recalled that the two men were inside the victim's house "a minute or two" before she heard "like this pow." Approximately a minute later, the two men came running back to the car. Montario Ostine threw "a whole lot of stuff" in the back seat where she was seated, and then he drove away. Tavaigner Harrison said that she looked in the bag that Montario Ostine threw in the car, and she remembered seeing "a couple of cameras" and a pistol. She said the pistol was not the one she had borrowed from Mr. Short.

Tavaigner Harrison testified that she told Montario Ostine and the [Petitioner] that she heard the gun go off and asked the [Petitioner] if he had shot the victim. The [Petitioner] said, "[Y]es." When she asked why, the [Petitioner] said he had told the victim to "be still," and the victim had "kept moving." Tavaigner Harrison said that she asked the [Petitioner] where he shot the victim, and the [Petitioner] said he shot the victim in the back of his head. On the drive back to Nashville, Montario Ostine stopped at a convenience store. She said that she did not know that the [Petitioner] and Montario Ostine had taken the victim's wallet until "[they] were pulling in the gates of [her] apartment." Once inside her apartment, they sorted through the victim's belongings. The [Petitioner] told her to cut up the victim's credit cards, and she did so. The [Petitioner] also gave her Mr. Short's gun, and she returned it to Mr. Short the following day. Other than the items she sold

to Mr. Short, she was unaware of where or how the other stolen items were disposed of.

Tavaigner Harrison testified that, on the night of the robbery and shooting, the [Petitioner] wore dark clothing. She said that Montario Ostine had a box of latex gloves. While in the parking lot of the post office, she observed the two men put on latex gloves. She said that "one of" the men also had a pair of black knit gloves.

Tavaigner Harrison testified that after her sister, Joycean Harrison, was arrested in connection with these crimes, she called Montario Ostine and told him about the arrest and that she would not allow her sister to "suffer for what we did." A short time later, the [Petitioner] called Tavaigner Harrison, and she related the same information to him. He told her not "to say anything that if [she] said anything that somebody wasn't going to walk free." She said that the [Petitioner] was not referencing jail in this statement, and she felt threatened.

Tavaigner Harrison testified that, for her role in these crimes, she had been convicted of facilitation to commit first degree murder and that she had received a fifteen-year sentence.

. . . .

Terry Arnie, a TBI special agent forensic scientist, testified as an expert in the field of firearms identification. Agent Arnie examined a CalTech-9 semi-automatic pistol, the cartridge found in the victim's home and the bullet found in the victim's kitchen sink. Agent Arnie conducted a comparison test and determined that the cartridge case had been fired from the CalTech-9 semi-automatic pistol[.]

. . . .

Agent Arnie testified that the police also submitted a rear gun sight for examination. Based upon his examination, Agent Arnie stated that the rear sight found in the victim's home appeared to be consistent with a rear sight from a Caltech-9. Agent Arnie confirmed that all Caltech-9 guns have a rear sight.

. . . .

9

Jennifer Shipman, a TBI forensic scientist, testified as an expert witness in the field of serology and DNA. . . . Agent Shipman [ ] analyzed a pair of knit gloves on which she found the presence of blood. The DNA profile from the blood was matched to the DNA standard for the victim. The inside of the knit glove presented the presence of human DNA, and the [Petitioner] could not be excluded as the minor contributor of the profile. . . .

Agent Shipman testified that she analyzed a pair of shoes related to the case. DNA material was found on the inside and the outside of the shoe. A partial profile was obtained from the outside of the shoe that matched the victim's DNA standard. The DNA profile from the inside of the shoe was consistent with a mixture of genetic material from at least two individuals, and the [Petitioner] could not be excluded as a contributor to the material.

Jason Matlock, an Ashland City police department officer, testified that . . . he conducted an interview on March 17, 2011, with the [Petitioner] at the Ashland City Police Department. Deputy Chief Kenneth Ray was also present during the interview. He said that he read the [Petitioner] his rights before video recording the interview. During the interview, the [Petitioner] asked to make a telephone call to a person he referred to as his "Mama," but he later told Officer Matlock it was his "Auntie." Officer Matlock said that he allowed the [Petitioner] to make the call to his aunt, on speaker phone, during the interview. The audio recording of the interview and telephone call were played for the jury.

On the video recording of Officer Matlock's interview with the [Petitioner], Officer Matlock can be heard reading the [Petitioner] his rights. He asked the [Petitioner] if he was willing to talk with the police and the [Petitioner] said that he was. The [Petitioner] signed a waiver of his rights. Officer Matlock told the [Petitioner] what the charges against him were, and gave the [Petitioner] an opportunity to tell the police his "side of the story." The [Petitioner] denied committing the murder. He agreed that he had previously been through Ashland City, but he could not say whether he was in Ashland City on the date at issue. Officer Matlock told the [Petitioner] that the proof showed that he was at the victim's house the night of the victim's murder. Officer Matlock told the [Petitioner] that Montario Ostine and Tavaigner Harrison had both given full confessions. The [Petitioner]

was informed that the death penalty was a potential sentence for the crimes and that his cooperation would "make things look better for [him]."

The [Petitioner] asked the officer if he could make a telephone call to his aunt, and the officer agreed. During the telephone call, the [Petitioner] told his aunt that he was going to tell the truth and go to jail. He asked her to take care of his "babies." He told his aunt that he was going to be in jail "for awhile," possibly fifty-one years. He relayed to her that the police had told him if he cooperated that his time would be shortened. He stated that there were no promises. After speaking to his aunt, the [Petitioner] immediately confessed to killing the victim. He stated, "I done it. I done every bit of it. . . . I am the trigger man. I did shoot that man." He explained that he went into the house and "beat the hell out of that man." He said he was terrified that the victim was going to "get out" and tell on him. He told the police that he thought it would all go away if he shot the victim, but that it had not gone away. He expressed remorse for killing the victim and stated that he wished he could take it back. He said Tavaigner Harrison was angry at the victim and convinced the [Petitioner] to go and rob him. The [Petitioner] told the police officers that he did not know about a sex tape involving Tavaigner Harrison's sister until after the incident. The [Petitioner] stated that he participated in the robbery because he needed money.

On the recording, the [Petitioner] told the police that he gave the gun stolen from the victim's house, a .38 revolver, to a man "in the neighborhood." He recounted that he, Montario Ostine, and Tavaigner Harrison drove around in Montario Ostine's car looking for the victim's house. When they found the victim's house, they passed the house three or four times, and there were "two white ladies" at the house. They waited at a nearby ball park where Tavaigner Harrison asked him to steal a GPS from a pick-up truck.

The [Petitioner] told the police that, when the group returned to the victim's house, Montario Ostine parked on a side street. Montario Ostine and the [Petitioner] entered the victim's home through the side door of the house and found the victim seated at an "island" or "bar." The [Petitioner] announced that the victim was being robbed and ordered him to the floor. The victim did not comply with the [Petitioner]'s instructions to get on the floor, so the [Petitioner] struck the victim repeatedly and then dragged him into the dining room. He told the victim to stay in the dining room and "let

11

[his] brother do what he needed to do." Once again, the victim did not comply and kept moving. The [Petitioner] said he struck the victim three or four more times with the pistol on the back of the head. When the victim tried to crawl toward the door, the [Petitioner] told the victim if he did not stop, the [Petitioner] would shoot the victim. The victim jumped up, and the [Petitioner] shot him. He said Montario Ostine was "in the back" and had a bag with some "camera stuff" in it. After killing the victim, the [Petitioner] told Montario Ostine that they needed to leave. On the recording, the [Petitioner] told the police that Montario Ostine grabbed a gun and a bag with some change and that the [Petitioner] took the victim's wallet as they were leaving the house.

The [Petitioner] recounted the events following the robbery and shooting. He recalled that the group stopped at a store on the drive back to Nashville. At Tavaigner Harrison's apartment, he cleaned Mr. Short's gun and gave Tavaigner Harrison the gun to return to Mr. Short. In the recording, he said that he and Montario Ostine both threw items into the apartment complex dumpster. He stated that he threw his shoes and the victim's wallet into the dumpster and later burned his clothing. The [Petitioner] told the officers that there was $40.00 in the victim's wallet, and it was split between "everyone involved." He said Tavaigner Harrison had told them the victim would have five to six thousand dollars at the house and many items of value. He told the police that he wore a blue bandana and Montario wore a red bandana. The [Petitioner] said that he wore black clothing and gloves on the night of the robbery.

In the video-recorded interview, the [Petitioner] told police that he, Montario Ostine, and Tavaigner Harrison went to Mr. Short's apartment to get the gun before the robbery. He said that Mr. Short gave either Montario Ostine or Tavaigner Harrison the gun. The [Petitioner] recalled that he did not take possession of the gun until they were in the car to go to Ashland City. He said that Tavaigner Harrison was unsure of the exact location of the victim's home and that they initially drove past Ashland City. Tavaigner Harrison realized they had gone too far, and they turned around and drove back to Ashland City.

Officer Matlock testified that the evidence at the crime scene was consistent with the [Petitioner]'s statements about the crimes.

. . . .

12

The [Petitioner] testified that he did not kill the victim and was not in Ashland City on the night the victim was killed. The [Petitioner] denied placing any items in a dumpster at the apartment complex. The [Petitioner] acknowledged his videotaped confession but explained that he lied to the police to protect Montario Ostine. He said that, at the time of the confession, he was concerned about a possible death sentence or life sentence for himself and his brother.

On cross-examination, the [Petitioner] stated that on the night of these crimes he was at his sister's apartment complex until about 11:30 p.m. and then he went to "Sammy's house."

*Ostine*, 2015 WL 7009058, at *1-11.

On August 22, 2014, the Tennessee Supreme Court issued an opinion, *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014), that addressed the review of prosecutorial misconduct in the context of remarks about a defendant's decision to not testify. The *Jackson* opinion clarified the law involving the varying standards of review applicable to different categories of error. Thereafter, our Supreme Court remanded the Petitioner's Rule 11 application with respect to the prosecutorial misconduct allegation to this court for reconsideration in light of *Jackson*. On remand, considering the *Jackson* factors, this court concluded that based upon the strength of the evidence at trial, the prosecutor's statement referencing the Petitioner as "the black guy from Nashville" did not affect the jury's verdict.

The Petitioner timely filed a post-conviction petition, contending that he received the ineffective assistance of counsel, as relevant on appeal, because: (1) trial counsel failed to object to the prosecutor's improper comments during closing argument; and (2) trial counsel failed to locate and call two alibi witnesses. The post-conviction court held a hearing during which the Petitioner's attorney ("Counsel") and the Petitioner testified. We will summarize the testimony as it relates to the two issues maintained on appeal.

Counsel had been licensed as an attorney for forty-two years and participated in around 400 trials. Counsel represented the Petitioner at trial and on appeal. At trial, the Petitioner testified. No other witnesses testified for the defense. Counsel recalled talking with the Petitioner about alibi witnesses but determined that there were not any. He noted that, in his experience, "alibi defenses are rare."

13

Counsel testified that he initially challenged the Petitioner's video confession by filing a motion to suppress. He asserted that the confession was false and involuntary. The trial court ruled that the confession was voluntary, and Counsel determined that it was voluntary based upon the video. He then shifted the defense to challenging the confession on the basis that the Petitioner made the false confession to protect his brother from a possible death penalty. As Counsel talked with the Petitioner, the Petitioner stated that he was not at the scene of the crime. Counsel responded that the Petitioner needed to identify witnesses that could collaborate that claim. The Petitioner could not provide Counsel with the names of any people that were of benefit. Counsel spoke with one female that was not interested in assisting the defense.

Counsel testified that he spoke with the Petitioner's sister about a written statement from the Petitioner's co-defendant, Montario Ostine. Counsel could not recall whether she gave him the statement, but he did not attempt to introduce a document of that nature at trial.

Counsel's final strategy at trial was for the Petitioner to testify that he was trying to protect his brother when he confessed and that he was not present during the crime.

Counsel recalled the State's closing argument during which the prosecutor stated, "[a]nd Robert Guye was in his home and he just wanted to live, folks. He just wanted to live. He kept struggling to live. Sounds like he couldn't trust the black guy from Nashville to let him live." In the motion for new trial, Counsel challenged this statement as improper and prosecutorial misconduct. Counsel, however, acknowledged that he did not object contemporaneously at trial. He explained that he did not do so because, in his experience in recent years, the appellate courts have "given great attention" to prosecutorial misconduct. As such, issues involving prosecutorial misconduct are rarely waived, as evidenced by the fact that the issue was determined on its merits in the Petitioner's direct appeal. Counsel stated that, at the time, he chose not to object and have a curative instruction affect the issue on appeal. He did not believe the appellate courts would waive the issue due to the absence of a contemporaneous objection. He stated that in retrospect, "maybe [he] should have [objected]." Counsel agreed that on appeal, the appellate courts agreed that the statement about the Petitioner's race was "unnecessary and irrelevant," but that the statement was isolated in the context of the entire closing argument.

Counsel testified that the prosecutor also referenced the victim's race during closing argument and that he did not raise that issue in his motion for new trial. He did not recall why he did not raise the reference to the victim's race, only challenging the prosecutor's reference to the Petitioner's race. Counsel stated that the Petitioner was concerned about his race being a factor at trial due to the lack of people of his race in Cheatham County.

14

On cross-examination, Counsel agreed that he did raise the issue of race on appeal and the appellate court determined that the statement did not affect the jury verdict. He agreed that an objection would have led to a curative instruction and drawing more attention of the statement to the jury, which were both results he did not want. He confirmed that the decision not to contemporaneously object and pursue the issue on appeal was a "strategic decision based on [his] knowledge and experience with the appellate courts." He explained that his options were to get a not guilty verdict or try to win on appeal. He did not believe a Cheatham County jury would likely acquit the Petitioner based on the facts. Based upon his experience in the appellate courts, as soon as the prosecutor made the statement, Counsel thought, "There's my issue, prosecutorial misconduct."

On the issue of alibi witnesses, Counsel confirmed that on direct examination at trial, the Petitioner did not mention alibi witnesses. Counsel agreed that it was during cross-examination when the prosecutor pressed the Petitioner to answer as to his whereabouts, the Petitioner stated, "he was playing dominoes with people." Counsel agreed that he could not confirm an alibi, so he could not assist the Petitioner on direct in "manufacturing an alibi witness," but maintained that the Petitioner could say that he was not at the crime scene.

The Petitioner testified he told Counsel about alibi witnesses, and Counsel failed to call those witnesses. He identified a man named "Palmer," who had a barber shop on Trinity Lane, and a man named "Old Man Sammie," who stayed in an apartment next to the Petitioner's sister. The Petitioner did not know either witnesses' last name and could not provide an address for either man. The Petitioner noted that "Sammie" had since died. The Petitioner testified that he told Counsel about both witnesses, but Counsel was unable to find them.

The Petitioner testified that with respect to the prosecutor's mention of race, he left that issue up to Counsel because he did not realize that the prosecutor could not reference race.

After hearing the evidence, the post-conviction court issued a written order denying relief, finding that the Petitioner had not established deficient performance and prejudice on any of the issues; thus, the Petitioner had failed to prove ineffective assistance of counsel. It is from this judgment that the Petitioner appeals.

15

## II. Analysis

On appeal, the Petitioner claims that he received the ineffective assistance of counsel based upon two issues. He asserts that Counsel was ineffective for failing to investigate and present two alibi witnesses and that Counsel failed to contemporaneously object when the prosecutor referenced the Petitioner's race during closing argument. He also asserts that he is entitled to relief based upon the cumulative effect of Counsel's errors. The State asks this court to affirm the post-conviction court's judgment.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the

16

"distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Alibi Witnesses

The Petitioner asserts that Counsel failed to investigate and call two alibi witnesses at trial and that this failure prejudiced his defense. The State responds that the Petitioner failed to show that Counsel was ineffective for failing to locate and call the witnesses because the Petitioner did not present the testimony of those witnesses at the post-conviction hearing.

> In its written order, the post-conviction court found:
> The petition alleges that [the Petitioner]'s trial counsel failed to investigate and locate two alibi witnesses who would have testified that [the] Petitioner was not present during the victim's death. The court finds [Counsel] to be a credible witness. [Counsel] testified that [the Petitioner] mentioned he might have some alibi witnesses. However, [Counsel] determined that there were

17

no alibi witnesses and as such, did not file a notice of alibi. Moreover, [Counsel] testified that if you do not file a notice of alibi, then it limits the cross-examination by the prosecution of the defendant (in situations where the defendants testify that they were not at the scene of the crime). [The] Petitioner [ ] testified that he had alibi witnesses and told [Counsel] about it, but [the Petitioner] did not know their last names. [The Petitioner] also testified that he [had] limited knowledge regarding their whereabouts). [The] Petitioner [ ] testified that [Counsel] stated that he could not find the alibi witnesses. Of course, the burden of proof is on the Petitioner to show by clear and convincing evidence [ ] his allegations and that there was a violation of his constitutional rights on this issue. In this posture, the Petitioner has failed to carry his burden of proof as to both "deficient performance" and "prejudice."

The evidence does not preponderate against the post-conviction court's findings with respect to the potential alibi witnesses. The Petitioner failed to present either "Porter" or "Old Man Sammie" at the post-conviction evidentiary hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Because the witnesses referenced by the Petitioner did not testify at the evidentiary hearing, we cannot discern how Counsel's failure to interview them prejudiced him. *See id*. Moreover, Counsel testified that he did investigate potential alibi witnesses identified by the Petitioner, but his investigation revealed that there were no alibi witnesses. Accordingly, he has failed to establish deficiency.

## B. Contemporaneous Objection

The Petitioner asserts that Counsel was ineffective for failing to make a contemporaneous objection to the prosecutor's reference to the Petitioner's race during closing arguments. The State responds that this court has already determined that the evidence against the Petitioner was so "overwhelming," that the prosecutor's statement did not affect the verdict. *Ostine*, 2015 WL 7009058, at *18.

In its written order, the post-conviction court made the following findings:

The Court finds [Counsel] to be a credible witness. [Counsel] testified that he rarely objects to closing arguments by the prosecution that could potentially be prosecutorial misconduct, because it usually is never waived.

18

[Counsel] testified that the appellate court ruled on the prosecutorial misconduct issue regarding [the Petitioner]'s race and determined it on the merits (it did not get waived). [Counsel] testified that he did not want a curative instruction on this issue to affect the appeal and also to bring extra attention to it by objecting. Additionally, [Counsel]testified that he could not recall why he did not object to the prosecution referring to the victim's race in closing argument. Of course, the burden of proof is on the Petitioner to show by clear and convincing evidence of his allegations and that there was a violation of his constitutional rights on this issue. In this posture, the [P]etitioner has failed to carry his burden of proof as to both "deficient performance" and "prejudice." In closing, as stated by the trial court, this statement regarding race was "uncalled for" and "never should have been made", but the evidence of guilt was overwhelming and the statements did not affect the verdict.

(citations omitted).

The evidence does not preponderate against the post-conviction court's findings. This court is to give deference to matters of a trial attorney's strategy and tactical choices if the choices are "informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369). In this case, Counsel's decision not to make a contemporaneous objection was a strategic decision to preserve the issue for review on appeal without the consideration of a curative instruction. Additionally, he did not want to further draw the jury's attention to an issue of race. Counsel raised this issue in his motion for new trial and, on appeal, this court did review the issue on its merits as Counsel predicted. As the State correctly notes, this court has already determined that, given the weight of the evidence against the Petitioner, the comments did not affect the verdict. Therefore, the Petitioner has not carried his burden of showing that Counsel's strategic decisions were deficient and that those decisions caused him prejudice. The Petitioner is not entitled to relief.

### C. Cumulative Error

The Petitioner also alleges that the cumulative effect of Counsel's errors entitle him to relief. "Reversals for cumulative error are rare." *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). Our supreme court has summarized the doctrine as follows:

The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a

19

cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). In the post-conviction context, "a petitioner cannot successfully claim he was prejudiced by [trial] counsel's cumulative error when the petitioner failed to show [trial] counsel's performance was deficient." *Gooch v. State*, No. M2014-00454-CCA-R3-PC, 2015 WL 498724, at *10 (Tenn. Crim. App. Feb. 4, 2015), *no Tenn. R. App. P. 11 application filed*. The Petitioner has failed to prove that Counsel was deficient or that he was prejudiced by any of the deficiencies alleged in his brief. Therefore, the cumulative error doctrine does not apply in this case.

## III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE

20